UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20635-CIV-MARRA

SUNDALE, LTD., and KENDALL HOTEL
AND SUITES, LLC.,

       Appellants,

vs.

FLORIDA ASSOCIATES CAPITAL
ENTERPRISES, LLC,

       Appellee.

_____/

**OPINION AND ORDER**

THIS CAUSE is before the Court upon Appellants Sundale, LTD ("Sundale") and

Kendall Hotel and Suites, LLC's ("KHS")[1] appeal of the Bankruptcy Court's Finding of Fact and

Conclusions of Law with Respect to Final Judgment in Favor of Plaintiff/Counterdefendant

Florida Associates Capital Enterprises, LLC ("Bankruptcy Court Report"), dated October 8, 2010

(DE 1).  The appeal is fully briefed and ripe for review.  The Court has carefully considered the

briefing and counsels' oral arguments, and the Court is otherwise fully advised in the premises.

**I.  Background**[2]

This matter arises out of an adversary complaint filed by Florida Associates Capital

Enterprises, LLC ("FACE") to determine the extent, validity, and priority of its claims against

Sundale and KHS.  At the heart of this dispute between these three corporate entities, however, is

---

[1]  Because Sundale and KHS have the same interest in the present matter and are represented by the same counsel, they are collectively referred to as "Sundale" throughout this Order.

[2]  The underlying facts, gleaned from the parties' briefs and the Bankruptcy Court Report, are generally undisputed.  Those facts which are in dispute are explicitly identified.

a personal dispute between Raymond G. Chambers ("Mr. Chambers"), on the one hand, and Delphine Scutieri ("Mrs. Scutieri") and Phillip J. Scutieri, Jr. ("Mr. Scutieri"), on the other. Accordingly, it is necessary to discuss the origin, and eventual demise, of the relationship between these individuals.

### A.  The Parties

Mrs. Scutieri and her husband, Phillip Scutieri, Sr. ("Mr. Scutieri, Sr."), were the parents of Phillip Scutieri, Jr. ("Mr. Scutieri") and Joan Adubato ("Mrs. Adubato").  Mr. Chambers is a successful businessman that earned his fortune through leveraged buy-outs in the 1980s.  Mr. Chambers had a very close personal and professional relationship with the Scutieri family that dates back over forty years, and he maintains a close personal friendship with Frank Adubato ("Mr. Adubato"), the former husband of Mrs. Adubato.  Mr. Chambers' wealth and personal financial affairs are managed by a company called Van Beuren Management ("VBM"), the only clients of which are Mr. Chambers, his family, and various entities in which the Chambers' family has interests.  VBM is owned by David Roy and Kurt Borowsky.

Mr. Scutierei is the principal of both Sundale and KHS.  Sundale and its predecessors have owned the nine-acre tract of land in Miami, Florida ("Sundale Property") that used to house an assisted living facility for retired senior citizens.  In the mid-1970s, both Mr. Chambers and Mr. Adubato had business interests in the property.  The Sundale Property is at the center of the litigation presently before the Court.

### B.  Initial Negotiations

In November 1997, Mrs. Adubato became separated from Mr. Adubato.  On November 20, 1997, Mrs. Scutieri advised her son that she believed that Mr. Chambers, with the help of Mr.

Adubato, had taken certain assets from the estate of Mr. Scutieri, Sr. to begin his leveraged buy-out business.  Several days later, Mr. Scutieri met with Mr. Chambers.  After the meeting, Mr. Chambers sent a letter to Mrs. Scutieri in which he promised to "share everything" with Mrs. Scutieri.  On December 15, 1997, Mrs. Scutieri responded with a letter stating that she was disturbed with information recently brought to her attention, attaching a draft complaint where Mr. Chambers and Mr. Adubato were named as defendants.  Over the next 5 months, representatives from the two parties attempted to resolve the dispute between them.  In June 1998, Gary Moore, a mutual business associate of both Mr. Chambers and Mr. Scutieri, met with Mr. Scutieri in an attempt to resolve the dispute.  Mr. Scutieri informed Mr. Moore that he would require $420,000,000 to resolve the dispute, a number that was communicated to Mr. Roy.

What transpired next is heavily disputed.  Mr. Scutieri testified that shortly after the June 1998 meeting, Mr. Roy called Mr. Scutieri and assured him that VBM can be "very creative," but that "it was going to take some time to get [the details] worked out."  Phil Scutieri, Jr. Trial Testimony at p. 467-68.  Jacqueline Simmons ("Ms. Simmons"), a mutual friend of both the Scutieri family and Mr. Chambers, testified that, at the request of Mr. Scutieri, she reached out to Mr. Chambers to have a meeting.  Jacqueline Simmons Trial Testimony at p. 21-23.  At the conclusion of their meeting, it is undisputed that Mr. Chambers agreed to meet with Ms. Simmons and Mrs. Scutieri in an American Airlines conference room at the Miami International Airport ("Airport Meeting").

At the Airport Meeting, which took place in June 1999, Ms. Simmons testified that "[Mr. Chambers said that he understood from me that – he told Delphine that he understood from me that she wanted initially $10 million and she wanted it to go to her son, and then she said she

3

wanted the other total amount, which was $420 million, to be worked out, and that's what she told him she wanted." Jacqueline Simmons Trial Testimony at p. 37. Mr. Chambers testified that, at the Airport Meeting, he said he would not loan $10,000,000, but that he would tell his "financial advisors that they, (A), help [Mr. Scutieri] get a conventional first mortgage loan on the [Sundale Property] and, (B), if that loan fell short of the $10,000,000, that I would recommend to them that our entities provide up to $2 million in a subordinated second mortgage loan." Raymond Chambers Trial Testimony at p. 76. Ms. Simmons testified otherwise, attesting that Mr. Chambers promised to give $10,000,000 as an "initial payment of getting the monies back to [Mrs. Scutieri]." Jacqueline Simmons Trial Testimony at p. 39.

Shortly after the Airport Meeting, Mr. Roy made an arrangement with Mr. Inglis, an attorney and personal friend of Mr. Roy, to create FACE, the sole purpose of which was to provide funding for the project. The only two members of FACE are VBM and Mr. Inglis.

*C. The Funding*

From July 30, 1999, through November 11, 1999, FACE loaned Sundale a total of $1,700,000 through 8 different promissory notes personally guaranteed by Mr. Scutieri. The notes, however, were unsecured at the time because the portion of the Sundale Property involved in the project was already encumbered by an off-shore company owned by Mr. Scutieri and subject to a lien held by Ms. Simmons. On November 29, 1999, the original notes and personal guarantees were replaced by a $2,000,000 renewal promissory note, which was secured by the portion of the Sundale property involved in the project. Prior to the execution of this note, Mr. Scutieri was removed as a personal guarantor of the initial loans and the two liens on the property were removed. Also on November 29, 1999, the law firm of Ruden, McClosky, Smith, Schuster

& Russell, P.A. ("Ruden McClosky"), issued an opinion letter opinion as to the validity and enforceability of the November 1999 note and the mortgage and security agreement <u>See</u> FACE Trial Exhibit B9.

Between December 17, 1999, and March 22, 2000, FACE loaned Sundale an additional $5,300,000 through six additional loans, some of which were personally guaranteed by Mr. Scutieri, and some of which were secured by a mortgage and security agreement.  In conjunction with at least two of the transactions, Ruden McClosky issued an opinion letter opining as to the validity and enforceability of those mortgage and security agreements.  <u>See</u> FACE Trial Exhibit C21, C50.  Between July 30, 1999, and March 20, 2000, FACE loaned Sundale a total of $7,300,000, but Sundale never made a single payment of its obligation to FACE under any of the aforementioned notes.

*D.  Ocean Bank's Involvement*

On March 28, 2000, Mr. Inglis sent a letter to Mr. Scutieri informing him that FACE would not be providing any additional funding for the project.  In April 2000, the project stopped, according to Mr. Scutieri, due to a lack of funding.  In March 2001, Mr. Scutieri sought alternative financing and reached a tentative agreement with Ocean Bank.  The agreement would have Ocean Bank provide $10,000,000 in funding for the project in exchange for a first mortgage on the Sundale Property.  This agreement required FACE to subordinate its first lien position to Ocean Bank, something that FACE was unwilling to do.  Accordingly, Sundale's agreement with Ocean Bank fell through.

On May 25, 2001, Mr. Scutieri wrote a lengthy letter to Mr. Inglis alleging, for the first time in writing, that the funding was merely disguised as a loan.  The letter also accused Mr.

5

Chambers with interfering with Mr. Scutieri's ability to get a loan from Ocean Bank.  On June 19, 2001, Sundale, KHS, and Mr. Scutieri individually filed a complaint in the Southern District of Florida against FACE, Mr. Chambers, Mr. Adubato, and a number of other defendants.  The complaint alleged that at the airport meeting, it was agreed that the $10,000,000 loan would eventually be forgiven.  The complaint, however, was never served on FACE and was ultimately dismissed in November, 2001.

Finally, on September 7, 2001, Sundale closed a $12,000,000 loan with Ocean Bank ("Ocean Bank Loan").  The terms of the agreement provided for FACE's loans to be reduced to $3,250,000, and for FACE to subordinate its lien to the lien of Ocean Bank with respect to the remaining indebtedness.  Sundale was obligated to make quarterly interest payments until November 29, 2002, and then monthly payments thereafter.  All of the parties signed three separate modification agreements memorializing these requirements.  These agreements included a provision by which Sundale and Mr. Scutieri specifically and unequivocally granted a full and complete "release and discharge" to FACE and Mr. Inglis for "any and all manner of liabilities or claims that may exist."  Ruden McClosky again issued an opinion letter opining to the validity and enforceability of those modification agreements.  See FACE Trial Exhibit D40.

Sundale made all interest payments due to FACE through May 2005.  Despite the fact that Sundale stopped making payments at that time, FACE did not take any steps to collect the debt.  Mr. Inglis testified that FACE elected not to pursue its remedies under the loan agreements because it did not want to take over the project subject to the Ocean Bank loan, nor did it want to "inspire" Mr. Scutieri to file a lawsuit.

*E.  Adversary Proceedings*

On December 11, 2007, both Ocean Bank and FACE sent default notices to Sundale.  The next day, Sundale filed for protection under Chapter 11 of the United States Bankruptcy Code, and KHS did the same on January 30, 2008.

On May 1, 2008, FACE initiated this adversary proceeding by filing a two count complaint seeking a determination of the extent, validity, and priority of its asserted lien on the Sundale Property.  On November 17, 2008, Sundale and KHS responded by both denying FACE's allegations and asserting a number of affirmative defenses.  On July 30, 2009, Sundale and KHS filed a Second Amended Answer, for the first time asserting two counterclaims, one seeking a declaration that FACE's liens were not valid and enforceable and one for recoupment.

Both Sundale's affirmative defenses and counterclaims relied upon the same factual and legal bases, namely that FACE's lien was invalid and unenforceable because the funds advanced by FACE were intended to be a disguised loan as an initial payment by Mr. Chambers to the Scutieri family as partial payment of the monies Mr. Chambers wrongfully diverted from Phil Scutieri Sr.'s estate.  Although Sundale initially demanded a jury trial with respect to the claim of recoupment, at an August 31, 2009, hearing in the Bankruptcy Court, Sundale explicitly stated that it "decided not to move to withdrawal [sic] the reference."  The matter eventually went to trial before the Bankruptcy Court, after which FACE filed a motion for judgment on partial findings pursuant to Federal Rule of Bankruptcy Procedure 7052.

The Bankruptcy Court ultimately ruled in favor of FACE, finding that FACE "overwhelmingly established a prima facie case that it holds a valid, perfected lien against the Sundale Property and the Trustee Property.  Conversely, the Defendants failed to meet their

burden of proof in every aspect with regard to their affirmative defenses and their

counterclaims." Bankruptcy Court Report at 21.  To supports its ultimate findings, the

Bankruptcy Court stated, "I find the credibility of virtually all of the witnesses to be highly

questionable . . ." Bankruptcy Court Report at 24.

Sundale and KHS now appeal this ruling from the Bankruptcy Court.

## II.  Standard of Review

Recently, the Supreme Court of the United States rendered its decision in Stern v.

Marshall, 131 S.Ct. 2594 (June 23, 2011).  That decision has "a narrow holding, but potentially

enormous implications for bankruptcy courts and litigation in the federal courts."  Erwin

Chemerinsky, Enormous Confusion, NAT'L L.J., Aug. 29, 2011.  In the September 22 hearing

before this Court, Sundale alleged that Stern is applicable here.  Both parties have submitted

supplemental briefs on the issue.

*A.  The Supreme Court's Holding in Stern*

Congress has divided bankruptcy proceedings into three categories:(1) those that arise

under title 11; (2) those that arise in title 11; and (3) those that are related to a case under title 11.

See Stern, 131 S.Ct. at 2603 (citing § 157(a)).  "District courts may refer all such proceedings to

the bankruptcy judges of their district, and bankruptcy courts may enter final judgments in 'all

core proceedings arising under title 11, or arising in a case under title 11.' " Id. (quoting §§

157(a), (b)(1)) (emphasis supplied).  Congress has articulated 16 specific types of proceedings

that are considered to be "core proceedings" in which bankruptcy courts are statutorily authorized

to render final judgments.  See id. (citing §§ 157(b)(1)-(2)).  Section 157(b)(2)(C) of Title 11

defines "counterclaims by the estate against persons filing claims against the estate" to be one of

these "core proceedings." "Parties may appeal final judgments of a bankruptcy judge in core proceedings to the district court, which reviews them under traditional appellate standards." Id. at 2603-04. If a bankruptcy judge determines that a proceeding is "not a core proceeding, but . . . otherwise related to a case under title 11," then that judge may only "submit proposed findings of fact and conclusions of law to the district court." § 157(c)(1). In those matters, "[i]t is the district court that enters final judgment . . . after reviewing de novo any matter to which a party objects." Stern, 131 S.Ct. at 2604 (citing § 157(c)(1)).

Stern involved a tortious interference counterclaim, which arose under state common law, that the bankruptcy court determined to be a "core proceeding" as defined by § 157(b)(2)(C). See id. at 2611. After determining it had jurisdiction over the matter, the bankruptcy court rendered a final judgment on the state law counterclaim. See id. at 2600. The Supreme Court determined that the bankruptcy court had the statutory authority under 28 U.S.C. § 157(b) to issue a final judgment on the state law counterclaim, but that it was a violation of Article III of the United States Constitution for Congress to confer that authority upon the bankruptcy court. See id. The Supreme Court ultimately held:

> Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article. We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984. The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim. Accordingly, the judgment of the Court of Appeals is affirmed.

Id. at 2620 (emphasis supplied).

The Supreme Court also made clear that it did not intend its decision in Stern to have broad implications:

9

As described above, the current bankruptcy system also requires the district court to review de novo and enter final judgment on any matters that are "related to" the bankruptcy proceedings, § 157(c)(1), and permits the district court to withdraw from the bankruptcy court any referred case, proceeding, or part thereof, § 157(d). Pierce has not argued that the bankruptcy courts "are barred from 'hearing' all counterclaims" or proposing findings of fact and conclusions of law on those matters, but rather that it must be the district court that "finally decide[s] them. We do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a "narrow" one.

Id. at 2602 (emphasis supplied).

### B. Stern is Inapplicable Here

The facts presently before the Court are materially distinguishable from those in Stern. That case involved a tortiouos interference counterclaim that was a "state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy." Id. at 2611 (emphasis supplied).

Stern involved a complaint filed by a creditor seeking a declaration that his defamation claim was not dischargeable in the bankruptcy proceedings. Id. at 2601. The "proof of claim" at issue was "for the defamation action, meaning that [the creditor] sought to recover damages for [the claim] from [the] bankruptcy estate." Id. The debtor "responded to [the creditor]'s initial complaint by asserting truth as a defense to the alleged defamation and by filing a counterclaim for tortious interference." Id. That counterclaim alleged that the creditor "had wrongfully prevented [the debtor's husband] from taking the legal steps necessary to provide [the debtor] with half his property." Id. That counterclaim for tortious interference was the claim deemed by the Supreme Court to be a "state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy." Id. at 2611.

10

Here, the only state law counterclaim advanced by Sundale is that of recoupment. As further discussed below, the crux of Sundale's argument is that the "proof of claim" filed by FACE was never intended to be a loan, but rather the first of many payments Mr. Chambers was to make to the Scutieri family to satisfy a $420,000,000 debt. Sundale relied on this theory to advance numerous affirmative defenses against FACE's proof of claim and as the premise for its two counterclaims against Sundale. All of the affirmative defenses and the counterclaims thus have one common thread. A rejection of Sundale's version of the events as defenses to FACE's claims also undermines the two counterclaims. Similarly, a finding in favor of Sundale on its defenses to FACE's claims would necessarily result in a favorable ruling for Sundale on its two counterclaims. Either way, a resolution of the proof of claim necessarily resolves the recoupment and declaratory judgment counterclaims.

Because Sundale's counterclaims are necessarily resolved by resolution of FACE's proof of claim, the self-declared narrow holding in Stern is distinguishable from the facts presently before the Court. The question here, therefore, is whether a bankruptcy court can enter a final judgment on a state law counterclaim that is necessarily resolved by a ruling on the creditor's proof of claim in bankruptcy. Because the Stern Court emphasized that bankruptcy courts lack jurisdiction to resolve state law counterclaims that are not "necessarily resolved by a ruling on the creditor's proof of claim in bankruptcy," this Court concludes that those claims that are "necessarily resolved" are appropriate for final judgment by a bankruptcy court. Thus, when a counterclaim is "necessarily resolved" by a ruling on a creditor's proof of claim, the Court holds that bankruptcy courts can enter final judgments on such claims. Accordingly, the Court will review the factual findings of the decision below under a clear error standard, while reviewing

11

the bankruptcy court's conclusion of law under a *de novo* standard.  In re Harwell, 628 F.3d

1312, 1316 (11th Cir. 2010) (quoting Trusted Net Media holdings, LLC v. The Morrison Agency,

Inc. (550 F.3d 1035, 1038 (11th Cir. 2008) ("In bankruptcy appeals, this Court independently

examines the factual and legal findings of the bankruptcy court using the same standards as did

the district court.").[3]

Nonetheless, because the effect of Stern is still unsettled both in this circuit and

throughout the country, as discussed below, the Court has also independently reviewed the entire

record *de novo*.

### III.  Discussion

FACE initiated this present matter to determine the extent, validity, and priority of its

claims against Sundale and KHS.  In support of its claim, FACE relies on the loan documents

associated with the Ocean Bank closing, executed on September 7, 2001.  Sundale has asserted

nine affirmative defenses: (1) promissory estoppel; (2) unclean hands; (3) waiver; (4) fraudulent

---

[3] The Bankruptcy Court did not contend that it had authority over the counterclaim
pursuant to § 157(b).  Rather, the Bankruptcy Court asserted that it had "jurisdiction over the
Recoupment claim . . . under its 'related-to' jurisdiction . . ."  Bankruptcy Court Report at 3.
Despite declaring its jurisdiction over the counterclaim derived from the more restrictive §
157(c), the Bankruptcy Court nonetheless attempted to render a final judgment over the
Recoupment counterclaim, stating that "Judgment on Count II of the Counterclaim is granted in
favor of FACE and against Sundale and Mr. Scutieri."  Bankruptcy Court Report at 45.  As
established above, if a bankruptcy judge determines that a proceeding is "not a core proceeding,
but . . . otherwise related to a case under title 11," then that judge may only "submit proposed
findings of fact and conclusions of law to the district court."  § 157(c)(1).
    The Court finds that the Bankruptcy Court erred as a matter of law when it determined
that the recoupment counterclaim was "related to" a case under title 11.  The Court finds that the
Bankruptcy court did have authority over the counterclaim pursuant to § 157(b), which, as
discussed above, allows the Bankruptcy Court to render a final judgment so long as the claim is
"necessarily resolved" in deciding the creditor's claim.  Accordingly, although the Bankruptcy
Court erred in defining its jurisdiction over the matter, it did not err in rendering a final judgment
on the counterclaims.  See Stern, 131 S.Ct. 2617-18.

inducement; (5) duress; (6) fraudulent misrepresentation; (7) failure of consideration; (8) fraudulent inducement; and (9) equitable estoppel.  Sundale has also advanced two counterclaims: (1) determination of extent, validity and priority of FACE's alleged lien against the property; and (2) recoupment.

A.  *Universal Findings*

The crux of each of the arguments advanced by Sundale lies in its assertion that, at the airport meeting, Mr. Chambers promised Mrs. Scutieri that the loans in question were never meant to be repaid.  That promise, however, was never memorialized in writing.  Mr. Chambers testified that he merely promised to help find Mr. Scuitieri funding for his hotel project.  See Raymond Chambers Trial Testimony at p. 76.  Ms. Simmons testified differently, asserting that Mr. Chambers agreed to make a $10,000,000 payment, disguised as a loan, as the first of many payments aimed at repaying the Scutieri family.  See Jacqueline Simmons Trial Testimony at p. 39.  Preliminarily, the Court notes that it has independently reviewed all of the trial testimony and finds Mr. Chambers version of events to be more credible.  To the extent the Court may be legally required to review the Bankruptcy Court's findings and conclusions *de novo*, and not under an abuse of discretion standard, the Court finds that Mr. Chambers did not agree to advance $10,000,000, disguised as a loan, to Mr. Scutieri or Sundale.  The Court further finds that it is implausible that such a "payment" was merely an initial payment toward resolution of the Scutieri family demand of $420,000,000 to resolve the disputed claim.  The Court finds Sundale's contention that sophisticated business persons would resolve a multi-million dollar dispute in a fashion described by Sundale's witnesses as preposterous.

13

A review of the objective written documents entered into the record bolsters Mr. Chamber's testimony.  There is no question that the two parties walked away from the Airport Meeting with different understandings of what was agreed to.  What is undisputed, however, is that every single document executed by both Sundale and FACE thereafter supports a finding that the loans in question were meant to be repaid.  Over the course of eight months, Sundale entered into sixteen separate promissory notes that explicitly provided that Sundale was responsible for repaying those loans.  At no point over the course of those eight months did Sundale, Mr. Scutieri, or anyone else object to the validity of these loans.  In fact, at least two promissory notes had their validity independently verified by opinion letters issued by Ruden McCluskey.  See FACE Trial Exhibit C21, C50.  These opinion letters, along with the promissory notes themselves, clearly establish that these loans were issued with the expectation of repayment.

Moreover, Sundale did not challenge the validity of the promissory notes entered into prior to March 20, 2000 until _after_ FACE made clear its intent to discontinue funding Sundale's hotel project.  On May 25, 2001, Mr. Scutieri wrote a letter to Mr. Inglis claiming the invalidity of the loans, doing so for the first time in writing.  On June 19, 2001, Sundale, KHS, Mr. Scutieri, and Mrs. Scutieri filed a complaint against FACE and a number of other entities in the Southern District of Florida, which specifically alleged the invalidity of the loans.

Despite explicitly expressing its belief that the promissory notes were entered into fraudulently, Sundale reaffirmed those notes by entering into a new agreement with FACE on September 7, 2001, the agreement which governs the dispute presently before the Court.  All of the involved parties, including Sundale, signed three separate modification agreements

14

memorializing specific details about the new agreement.  See FACE Trial Exhibits D47, D48, and D49.  In fact, as part of these modifications, Sundale granted FACE a complete "release and discharge" for "any and all manner of liabilities or claims that may exist."  See FACE Trial Exhibits D47 at ¶ 14; D48 at ¶ 14; D49 at ¶ 14.  Accordingly, Sundale entered into the new promissory notes on September 7, 2001, without any basis for believing that it did not have to repay FACE.  Further bolstering the validity of the September 7, 2001, agreement is an additional opinion letter issued by Ruden McClosky opining to the validity and enforceability of those modification agreements.  See FACE Trial Exhibit D40.  For all of these reasons, the Court finds the September 7, 2001, Ocean Bank Closing Documents to be valid.  The burden therefore shifts to Sundale to overcome the presumed validity of the governing loan documents.

 With these findings in mind, the Court proceeds to address each of the individual affirmative defenses and counterclaims.

*B. Promissory and Equitable Estoppel*

 Under Florida law, "[t]he elements of estoppel are: (1) a representation as to a material fact that is contrary to a later-asserted position; (2) reliance on that representation; and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon."  Bristol West Ins. Co. v. Albertson, 41 So. 3d 378, 380 (Fla. 4th DCA 2010) (citing Lloyds Underwriters at London v. Keystone Equip. Fin. Corp., 25 So. 3d 89, 93 (Fla. 4th DCA 2009)).  The party seeking the estoppel must prove each of the elements by clear and convincing evidence.  See Hoffman v. State, Dep't of Magm't Services, Div., 964 So. 2d 163, 166 (Fla. 1st DCA 2007) (citing Castro v. E. Pass Enterprises, Inc., 881 So. 2d 699, 700 (Fla. 1st DCA 2004)).

15

For reasons discussed above, Sundale has failed to establish that FACE made "a representation as to a material fact that is contrary to a later-asserted position" by clear and convincing evidence.  Sundale's First and Ninth estoppel-based affirmative defenses thus fail for failing to establish the first element of an estoppel claim.

Sundale has also failed to prove that it reasonably relied on the alleged misrepresentation. The alleged misrepresentation was made in the context of negotiations to settle a dispute between Mr. Chambers and Mrs. Scutieri.  As a matter of law, any reliance on misrepresentations made in the context of an adversarial relationship is unreasonable.  See Megens v. Dreyfoos, 166 F.3d 1114, 1118-19 (11th Cir. 1999) (citing Pettinelli v. Danzig, 722 F.2d 706, 710 (11th Cir. 1984)). If Sundale did rely on statements made by Mr. Chambers it was in the context of an adversarial relationship.  Therefore, the Court finds as a matter of fact any such reliance was unreasonable.

Moreover, both Sundale and Mr. Scutieri's own conduct precludes Sundale from any reasonable reliance on statements made at the Airport meeting.  Through Mr. Scutieri's May 25, 2001, letter and the complaint filed in June 2001, to which Sundale itself was a plaintiff, Sundale clearly demonstrated that it knew of the alleged misrepresentations prior to the Ocean Bank Loan Documents being executed on September 7, 2001.  Sundale cannot now claim that it relied on an alleged misrepresentation after acknowledging, in writing, that it was aware of that very misrepresentation.

For all the aforementioned reasons, Sundale's First and Ninth equitable-based defenses fail.

### C.  Fraudulent Inducement Fraudulent Misrepresentation, and Unclean Hands

To establish fraudulent inducement or fraudulent misrepresentation in Florida, the party alleging fraud must prove by the greater weight of the evidence that a false statement concerning a material fact was made.  See White Const. Co., Inc. v. Martin Marietta Materials, Inc., 633 F.Supp. 2d 1302, 1325-26 (M.D. Fla. 2009) (citing Biscayne Inv. Group, Ltd. v. Guarantee Management, 903 So. 2d 251, 255 (Fla. 3d DCA 2005)) (defining the essential elements of a fraudulent inducement claim in Florida); Butler v. Yusem, 44 So. 3d 102, 105 (Fla. 2010) (defining the essential elements of a fraudulent misrepresentation claim in Florida).

For the reasons articulated above, Sundale has failed to meet its burden of proving that Mr. Chambers, or any representative of FACE, promised that the loans in question would never have to be repaid.  Accordingly, Sundale has failed to prove its Fourth, Sixth, and Eighth fraud-based affirmative defenses.

Sundale has also failed to prove its second affirmative defense of unclean hands.  In its Third Amended Answer, Sundale asserts that FACE has unclean hands because of a fraudulent scheme carried out by Mr. Chambers, Mr. Roy, and Mr. Inglis through FACE.  Again, the Court finds that Sundale has not met its burden of proving that FACE engaged in fraudulently activity. Accordingly, Sundale has also failed to prove its second affirmative defense.

### D.  Waiver

"[W]aiver, by definition, is the intentional relinquishment of a known legal right." Salinas v. C.A.T. Concrete, LLC, 46 So. 3d 600, 605 (Fla. 1st DCA 2010) (citing Unimed Lab., Inc. v. Agency for Health Care Admin., 715 So. 2d 1036, 1037 (Fla. 3d DCA 1998)) (emphasis supplied).

In its Third Amended Answer, Sundale alleges that

> FACE has waived any right it may have had to collect any monies from Defendants because FACE failed to demand payment from Sundale for a period of two and one half years and the funds advanced to Sundale were never intended to be real loans, rather the funds advanced by FACE to Sundale were a partial payment of a much larger repayment obligation owing from Mr. Chambers to Mr. Scutieri and his family.

¶ 94.

Sundale has failed to set forth any evidence that FACE <u>intentionally</u> relinquished its right to collect on the loans.  Although Sundale has correctly noted that FACE did not demand payment immediately after Sundale stopped making payments on the loans, "[m]ere delay is insufficient to support a defense of waiver or estoppel."  <u>Hale v. Dep't of Rev.</u>, 973 So. 2d 518, 523 (Fla. 1st DCA 2007) (citing <u>Goodwin v. Blu Murray Ins. Agency, Inc.</u>, 939 So. 2d 1098, 1104 (Fla. 5th DCA 2006)).  Sundale has failed to advance any evidence that FACE <u>intentionally</u> waived its rights to collect on the loans.  To the contrary, as previously discussed, all of the written documents entered into by both parties supports a finding that FACE fully intended to collect on the loans.  Accordingly, Sundale fails on this affirmative defense.

*F.  Failure of Consideration*

In its Seventh Affirmative defense, Sundale states that "Sundale's reaffirmation of the FACE debt and release of FACE and Michael Inglis in September 2001 are unenforceable because neither FACE nor Michael Inglis provided Sundale with any consideration in exchange for the reaffirmation and release."

This argument completely disregards the context in which the reaffirmation and release was signed.  After initially rejecting an offer from Ocean Bank to subordinate its loan, FACE negotiated with both Ocean Bank and Sundale to receive more favorable terms in what ultimately

18

ended up being the Ocean Bank Loan.  In exchange for subordinating its position on the Sundale

property to Ocean Bank, FACE received a larger lump sum payment and complete release and

discharge in consideration for its subordination.  The Ocean Bank Loan was clearly the product

of negotiations between Ocean Bank, Sundale, and FACE, and all three parties provided ample

consideration to support the enforceability of the Ocean Bank Loan: Ocean Bank agreed to

provide funding, Sundale provided a lien on its property, and FACE agreed to subordinate its

loan.  Sundale's affirmative defense of failure of consideration therefore fails.

*G. Duress*

"Florida courts have articulated two factors that must coexist when setting aside a

contract or settlement on the grounds of duress.  Specifically, '[i]t must be shown (a) that the act

sought to be set aside was effected involuntarily and thus not as an exercise of free choice or will

and (b) that this condition of mind was caused by some improper and coercive conduct of the

opposite side.' " Peralta v. Peralta Food, Corp., 506 F.Supp. 2d 1274, 1280 (S.D. Fla. 2007)

(quoting City of Miami v. Kory, 394 So. 2d 494, 497 (Fla. 3d DCA 1981)).  "Duress requires a

showing that the act of the party compelling obedience of another is unlawful or wrongful."

Franklin v. Wallack, 576 So. 2d 1371, 1372 (Fla. 5th DCA 1991) (quoting Norris v. Stewart, 350

So. 2d 31, 31-32 (Fla. 1st DCA 1977)).  "The burden of proof to show duress . . . in the

execution of a legal instrument lies with the party claiming duress."  Smith v. Paul Revere Life

Ins. Co., 998 F.Supp. 1412, 1416 (S.D. Fla. 1997).

Here, Sundale has failed to prove that FACE engaged in conduct that was "unlawful or

wrong."  In its Third Amended Answer, Sundale asserts that FACE engaged in "wrongful"

conduct when it threatened to stop funding if Sundale refused to release FACE from all liability.

Sundale fails to establish how such conduct is "unlawful or wrong." "[I]t is well established that duress cannot be predicated upon a threat or the performance of an act which a person has a lawful right to perform and duress is not established merely by proof that consent was secured by the pressure of financial necessity or circumstances of the person seeking to assert it." Friedman v. Bache & Co., 321 F.Supp. 347, 350 (S.D. Fla. 1970) (citing Kohen v. H.S. Crocker Co., 248 F. 2d 896 (8th Cir. 1957)).   FACE was fully within its legal rights to demand a release in exchange for subordinating its position on the Sundale property.  Accordingly, Sundale has failed to prove its affirmative defense of duress.

*H.  Recoupment*

Even if Sundale were to satisfy the requirements necessary for invoking the equitable doctrine of recoupment, Sundale has still failed to prove the merits of its underlying claim.  As stated above, the Court finds that all of the loans given to Sundale by FACE were always intended to be repaid.  Accordingly, Sundale is not entitled to equitable relief on this claim.  The Court therefore affirms those portions of the Bankruptcy Court's report and recommendation that find in favor of FACE and against Sundale.  Alternatively, in the event the Bankruptcy Court exceeded its constitutional authority in rendering a final judgment over the recoupment counterclaim, the Court enters judgment in favor of FACE on that counterclaim.

**IV.  Sundale Waived Its Seventh Amendment Right to a Jury Trial**

Finally, Sundale asserts that it should be afforded its Seventh Amendment right to a jury trial.  In support of this assertion, Sundale relies on the test articulated by the Supreme Court in Granfinanciera, S.A. v. Nordberg, 492 U.S. 33 (1989), to determine whether a jury trial exists in a bankruptcy proceeding.  Assuming, arguendo, that Sundale is correct in that it had a Seventh

20

Amendment right to a jury trial in this matter, the issue is moot because Sundale expressly waived that right in the proceedings below.

The Supreme Court has made clear that a Seventh Amendment right to a jury trial can be waived when a party consents to the jurisdiction of a bankruptcy court.  In Stern, the Court expressly rejected an argument by the appellant that the Bankruptcy Court lacked jurisdiction to enter final judgment.  See id. at 2606.  In holding that the appellant waived any objection to the Bankruptcy Court's jurisdiction over a state law claim, the Court stated:

> Given Pierce's course of conduct before the Bankruptcy Court, we conclude that he consented to that court's resolution of his defamation claim (and forfeited any argument to the contrary).  We have recognized "the value of waiver and forfeiture rules" in "complex" cases, Exxon Shipping Co. v. Baker, 554 U.S. 471, 487–488, n. 6, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008), and this case is no exception.  In such cases, as here, the consequences of "a litigant ... 'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor," Puckett v. United States, 556 U.S. 129, ——, 129 S.Ct. 1423, 1428–29, 173 L.Ed.2d 266 (2009) (some internal quotation marks omitted)—can be particularly severe.  If Pierce believed that the Bankruptcy Court lacked the authority to decide his claim for defamation, then he should have said so—and said so promptly.  See United States v. Olano, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (" 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited . . . by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it' " (quoting Yakus v. United States, 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944))).  Instead, Pierce repeatedly stated to the Bankruptcy Court that he was happy to litigate there.  We will not consider his claim to the contrary, now that he is sad.

Id. at 2608.

Here, like in Stern, Sundale "repeatedly stated to the Bankruptcy Court that [it] was happy to litigate there."  Although Sundale demanded a jury trial each time it pled its recoupment counterclaim, it failed to file a motion to withdraw the reference.   Such a failure, in and of itself, constitutes a waiver of the right to a jury trial.  See In re Latimar, 918 F.2d 136, 137 (10th Cir.

21

1990) ("Failure to make a [request transfer to the district court] was a waiver of the right to a jury trial.").

Even more compelling, however, is the fact that Sundale expressly stated, on the record, that it made a strategic decision not to file a motion to withdraw the reference. On August 12, 2009, the Bankruptcy Court conducted a status conference on Sundale's demand for a jury trial. At that hearing, the Bankruptcy Court ordered Sundale to file a motion to withdraw the reference within five days. On August 19, 2009, Sundale filed a motion for an extension of time to file the motion to withdraw the reference, which was granted by the Bankruptcy Court. Despite repeatedly demanding a jury trial and asking for an extension of time to file a motion to withdraw the reference, Sundale never filed such a motion.

On August 31, 2009, the Bankruptcy Court held another hearing in which it expressly asked Sundale why it never file its motion to withdraw the reference. The following dialogue ensued:

> THE COURT: I saw the brief filed by FACE with respect to the jury trial demand. I did not see anything filed by you, [FACE's counsel]. So I would like to know whether that means you agree that you're not entitled to a jury trial, or you're not filing anything else?
> And then --
> [SUNDALE'S COUNSEL]: We --
> THE COURT: -- the second question -- I don't want to know the answer yet. I want to have something to anticipate when I come back.
> MR. RUSSIN: It's very simple.
> THE COURT: Oh. Okay. Fine. Tell me now then.
> [SUNDALE'S COUNSEL]: We went through the analysis within the five day period as to whether to move to withdraw the reference. And our view was: Seeking a jury trial goes hand-in-hand with the withdraw of the reference issue, unless [FACE] agreed to try the case by jury in front of Your Honor. <u>**We decided -- the client decided not to move to withdrawal the reference**</u>. And we assumed that by not moving to withdraw the reference, because that trigger was shorter, that would send a pretty clear signal that we had

22

no intention of proceeding with a jury trial, unless the offer, which remained outstanding to FACE, was that they agree to a jury trial before Your Honor.

We still believe, although, I think [FACE's Counsel] has confirmed that FACE will not agree to a jury trial before Your Honor and, therefore, that takes us out of the potential for any jury trial. Without a motion to withdraw the reference, and without agreement from FACE, there's no chance of having a jury trial in this matter.

Just out of pure intellectual curiosity, Your Honor, we did look at the issue, and we did believe that while -- while the recoupment action, of course, did not give rise to a jury trial, we do believe that the affirmative defenses and the dec action to -- the affirmative defenses to FACE's dec action, and our dec action, because it sounds in common law claims that would give rise to a jury trial was fair game for a jury trial.

So, however, we agree that unless FACE agrees to a jury trial before Your Honor, that the jury trial issue is a non-issue.

THE COURT: Okay. Well, that's one less thing that my law clerk and I have to work on. Okay.

[SUNDALE'S COUNSEL]: Although, I would like some confirmation on the record from [FACE's counsel] that FACE will not agree to a jury trial before Your Honor, just because I want to close the record on this, because that is my understanding.

THE COURT: Okay. [FACE's counsel], would you agree to allowing me to try a jury trial?

[FACE's Counsel]: [I], personally, would be honored to try a jury trial in front of Your Honor. My client does not agree.

(Emphasis supplied).

The preceding dialogue establishes that not only did Sundale knowingly waive its Seventh Amendment right to a jury trial, it did so for strategic purposes. Accordingly, Sundale is not entitled to a jury trial on its recoupment claim.

## V.  Conclusion

For the forgoing reasons, it is hereby **ORDERED AND ADJUDGED** that with respect to the Bankruptcy Court's determination of the extent, validity, and priority of FACE's claims against Sundale, the Bankruptcy Court report dated October 8, 2010, is **AFFIRMED** to the extent the bankruptcy court had the authority to rule. However, to the extent the bankruptcy

court exceeded its authority to enter a final judgment, the Court considers the bankruptcy court's findings of fact and conclusions of law as a report and recommendation.  The Court, after a *de novo* review of the record, adopts and ratifies the bankruptcy court's report and recommendation.

Accordingly, the Court affirms the Bankruptcy Court's ruling.  To the extent the bankruptcy court exceeded its authority by entering final judgment, this Court enters **FINAL JUDGMENT** in favor of  Plaintiff/Counterdefendant Florida Associates Capital Enterprises, LLC and against Creditor/Defendants Sundale and Kendall.[4]

The Clerk shall **CLOSE** this case.  All pending motions are **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 13th day of February, 2012.

_____

KENNETH A. MARRA
United States District Judge

Copies to:
Counsel of record

---

[4] The Court notes that on January 10, 2012, the Court granted a motion filed by Sundale's counsel to withdraw from this case.  DE 41.  Should Sundale or its principles seek to file an appeal, they must retain counsel to do so.  See Palazzo v. Gulf Oil Corp., 764 F.2d 1381, 1385 (11th Cir. 1985), cert. denied, 474 U.S. 1058 (1986) (articulating well-settled principle of law that a corporation cannot appear pro se and must be represented by counsel.).